**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

EVELYN MOSS for
WENDY S. SIMPSON, deceased,

        Plaintiff,

v.                                 No. CIV 07-94 LFG

MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

      Plaintiff Evelyn Moss, on behalf of her deceased daughter Wendy S. Simpson ("Simpson"),

invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision

of the Commissioner of Social Security ("Commissioner").  The Commissioner determined that

Simpson was not eligible for social security benefits ("SSI") or disability insurance benefits ("DIB").

Simpson moves this Court for an order reversing the Commissioner's final decision and granting an

immediate award and payment of benefits or remanding for a new hearing.  [Doc. Nos. 12, 13, 15.]

**Background**

      Simpson was born on January 18, 1957 and was 49 years old when the administrative law

hearing was held on March 23, 2006.  [Tr. 46, 58, 411, 414.]  On June 2, 2006, Simpson died of

cardiopulmonary arrest, end-state liver disease and alcoholism.  [Tr. 276.]  She suffered from liver

cirrhosis secondary to alcohol use and had a long history of alcohol abuse, beginning at about age 14.

1

[Tr. 120, 328.]  Prior to her death, Simpson lived with her mother Evelyn Moss.  [Tr. 415.]  Before moving to New Mexico in February 2004  to be with her mother, Simpson lived in Colorado and Indianapolis, part of which time she was homeless and unemployed.  [Tr. 102, 206, 415.]  Simpson had three to four marriages [Tr. 58-59], all of which ended due to "everybody's alcohol use" [Tr. 207].  She had no children.

Simpson stopped going to high school during her senior year due to a back injury, but obtained her G.E.D. in 1997 when she was 40 years old.  [Tr. 74, 207, 414.]  She worked periodically as a waitress in Indiana during part of the 1980's and also from April 1998 to April 2001.  [Tr. 69, 415-17.]  She may have worked as a cashier in late 2001 for three to four months at a liquor store in Colorado before she was beaten up by an ex-boyfriend or a roommate.  [Tr. 417.]  At the time of the ALJ hearing, Simpson received General Assistance and food stamps, along with financial help from her mother.  [Tr. 415.]  Simpson's past relevant work history was as a waitress.  [Tr. 18, 19.]

On October 8, 2003, Simpson applied for SSI and DIB.[1]  [Tr. 60, 271.]  She claimed she was unable to work dating from April 2001, because of disabilities.  She explained at the ALJ hearing that she selected April 2001 as the onset date of disability because she "could not remember."  [Tr. 415-16.]  She last worked in 2001.  She alleged she was unable to work because of "depression, neuro-myopathy, 1994 Degenerative arthritis, 2000 Alcoholism and 1970 inability to walk."  [Tr. 68.]  She further stated she was unable to "walk correctly" and used a walker to get around.  [Tr. 68.]  While Simpson worked after the time she began to suffer from these problems, she claimed she had to work fewer hours, perform different duties and could not walk or sit for long.  [Tr. 68.]

---

[1]Simpson filed one earlier application for benefits that was denied in 1988.  [Tr. 58, 64.]

On March 23, 2006, Administrative Law Judge ("ALJ") George W. Reyes held a hearing, during which Simpson was present and represented by counsel.[2]  [Tr. 12, 411.]  On June 2, 2006, Simpson died, and on June 13, 2006, Simpson's mother, Evelyn Moss, substituted herself in this matter on behalf of Simpson.  [Tr. 275.]  In a decision, dated June 15, 2006, Judge Reyes found that Simpson was under a disability but that a substance abuse disorder was a contributing factor material to the determination of disability.  [Tr. 12.]  Thus, the ALJ determined that Simpson was not eligible for SSI or DIB.  [Tr. 13.]  On December 5, 2006, the Appeals Council denied Simpson's request for review.  [Tr. 4.]  This appeal followed.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[3]  The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[4]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[5] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits his physical or mental ability to do basic work activities . . . .;"[6] at step three,

---

[2]An earlier ALJ hearing was scheduled in November 2005, but Simpson elected not to proceed without counsel.  [Tr. 447.]

[3]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[4]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[5]20 C.F.R. § 404.1520(b) (1999).

[6]20 C.F.R. § 404.1520(c) (1999).

the Commissioner must conclude the claimant is disabled if she proves that these impairments meet

or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App.

1 (1999);[7] and, at step four, the claimant bears the burden of proving she is incapable of meeting the

physical and mental demands of her past relevant work.[8]  If the claimant is successful at all four of

the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering

claimant's RFC,[9] age, education and past work experience, she is capable of performing other work.[10]

If the Commissioner proves other work exists which the claimant can perform, the claimant is given

the chance to prove she cannot, in fact, perform that work.[11]

## Standard of Review

On appeal, the Court considers whether the Commissioner's final decision is supported by

substantial evidence, and whether the Commissioner used the correct legal standards.  Langley v.

Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and

sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than

a mere scintilla, but it need not be a preponderance.  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir.

2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004).  The

Court's review of the Commissioner's determination is limited.  Hamilton v. Sec'y of HHS, 961 F.2d

---

[7]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[8]20 C.F.R. § 404.1520(e) (1999).

[9]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[10]20 C.F.R. § 404.1520(f) (1999).

[11]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

1495, 1497 (10th Cir. 1992).  The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence.  Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).  Grounds for reversal also exist if the agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards.  Hamlin, 365 F.3d at 1114.

It is of no import whether the Court believes that a claimant is disabled.  Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied.  Hamilton, 961 F.2d at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

After reviewing all of the evidence, the ALJ rejected Simpson's' claims for SSI and DIB, concluding that while she was under a disability, a substance abuse disorder was a contributing factor material to the determination of her disability.  Thus, she was not disabled under the SSA.

In so concluding, the ALJ made the following findings: (1) Simpson was not engaged in substantial gainful activity during the pertinent time frame; (2) she had severe impairments of: "alcohol dependence with alcoholic liver disease, and neuropathy/myopathy; degenerative joint

disease; history of right wrist fracture; history of left foot fracture; and, a history of depression;" (3) Simpson's impairments, including the substance use disorder(s), met the criteria for a listed impairment, i.e., § 11.14 of 20 CFR Part 404, Subpart P, Appendix 1 ("peripheral neuropathies"); (4) if Simpson stopped the substance use, the remaining limitations would cause more than a minimal impact on her ability to perform basic work activities; therefore, the claimant would continue to have severe impairment(s) or a combination of such impairments, i.e., her degenerative joint disease and residuals from her fractures and alcohol abuse would remain even if she stopped drinking; (5) if Simpson stopped the substance abuse, she would not have a severely medically determinable psychological impairment; (6) if Simpson stopped the substance abuse, she would not have an impairment or combination of impairments that met listing requirements; (7) if Simpson stopped the substance abuse, she would have the RFC to perform a full range of light work and would be able to perform her past relevant work as a waitress; and (8) because she would not be disabled if she stopped the substance abuse, the substance use disorder is a contributing factor material to the determination of disability and Simpson is not disabled within the meaning of the SSA. [Tr. 14-19.]

In this appeal, Simpson argues:  (1) substantial evidence does not support the ALJ's finding that Simpson's' alcohol abuse was a material factor contributing to her disability and the ALJ failed to follow the required administrative procedure in assessing such a disorder; (2) the ALJ committed legal error in finding Simpson did not suffer from a severe psychological impairment, i.e., depression or a mood disorder; and (3) the ALJ erroneously determined that Simpson could return to her past relevant work as a waitress if she ceased the use of alcohol because the ALJ did not complete the required analysis under SSR 82-61 and Tenth Circuit case law.

Respondent argues that substantial evidence supports the Agency's final decision which is consistent with applicable law. Thus, according to Respondent, the ALJ's decision should be affirmed.

### Summary of Simpson's' Medical Conditions and Care

### *2000*

Simpson's' medical records or disability application forms sometimes refer to earlier medical treatment, conditions, and injuries. However, the earliest medical record in the administrative record is from September 13, 2000, when Simpson was 43 years old. Simpson then lived in Indiana and was seen at the Wishard Health Services in Indianapolis related to alcohol withdrawal. [Tr. 180-82.] On September 13, Simpson complained of sleep problems, anxiety, guilt, and emotional trauma but "depressed mood" was not checked off on the intake form. Simpson admitted alcohol addiction and heavy alcohol use or dependence. She stated she had had a relapse earlier in the year and began drinking a "fifth" three to five times a week. She felt her drinking was "getting out of control" and had stopped drinking about two weeks before this visit.

On September 13, 2000, Simpson also reported that she had a "neuromyopathy x1 year in 1994 for which she required a walker" but that she had no symptoms at present. Simpson was taking no medications at this time, and the health care provider noted that she might be at risk for medical complications of alcohol abuse. Her treatment was to attend a recovery group, twice a week and case management as needed. [Tr. 183.] There is a record dated September 25, 2000 indicating Simpson attended one 90-minute recovery group session, but there are no other group therapy records in the administrative record. [Tr. 179.]

Simpson's September 2000 medical record also notes psychiatric history in 1994, for which she was hospitalized.  From 1995 to 1997, she reported she saw a psychologist, but there are no corresponding records.  Simpson stated that her grandfather abused her when she was 14 years old.  In 1991, she was arrested for a DUI.  In September 2000, Simpson wished to get help for her drinking problem and was excited about a new job.  [Tr. at 180-82.]  She reported a ten-year history of alcohol abuse, although other records note she was drinking for 29 years. [Tr. 120.]

On October 18, 2000, Simpson was seen at the hospital for back and neck pain after a motor vehicle accident.  No x-rays were taken initially, but current x-rays showed mild degenerative changes with no acute findings in her neck and spine.  Her thoracic spine series was normal.  [Tr. 132, 137.]

On October 24, 2000, Simpson was seen at the ER and admitted for several days after a three-day binge on alcohol.  Some of these medical records note that Simpson started drinking at age 14, both parents were alcoholic but her mother had been sober for 15 years, and that her twin sister was also alcoholic.  [Tr. 120.]  Simpson stated she had been through a detoxification program for 10 days in 1992 and had been sober for five years although she had not attended Alcoholics Anonymous ("AA").  There is no objective medical evidence to confirm that Simpson had any prolonged periods of sobriety.  In late October, Simpson stated she had been binging on alcohol for two to three weeks and had suffered blackouts.  She also admitted to having used marijuana and taken pills in a suicide attempt.  She denied any suicidal ideation on October 24, 2000.  She claimed to have unresolved sexual abuse issues from childhood.  No depression or neurological problems were noted on the medical records.  Simpson stated she was hospitalized 3-4 times in the past related to drinking or attempted withdrawal from alcohol.  Simpson did not want to return to group therapy because she said she was the only non court-ordered individual in attendance.  [Tr. 127.]

The October 26, 2000 discharge summary states Simpson suffered from nausea and vomiting after drinking whiskey for three days. [Tr. 114-16.] She had a "benign medical history." Simpson was to be seen at the Stress Center for counseling every day until she was stable. [Tr. 114.] There are no corresponding records to show she attended counseling.

### *2001*

There are no medical records for 2001, although Simpson states her onset of disability was April 15, 2001 and that she stopped working sometime in 2001. It appears that Simpson worked for some months in 2001, both before and after April 2001. [Tr. 107, 415-16.]

### *2002*

In August and September 2002, Simpson was seen at the hospital for fractures of her left wrist and right foot after being assaulted. [Tr. 145, 146, 147, 148, 151, 153, 159.] Some of the medical records indicate "no alcohol use." [Tr. 146.] A record, dated August 12, 2002, states that Simpson was thrown outside a bar while intoxicated, at which point she suffered injuries to her wrist, hand, and elbow. [Tr. 164.]

On August 11, 2002, she was seen for edema. [Tr. 163, 178.] On August 19, the ER record indicates that Simpson reported occasional alcohol use, [Tr. 159], but an August 14, 2002 record states there was a history of alcohol abuse. Apparently, Simpson's wrist injury or re-injury stemmed from an incident with her ex-boyfriend who twisted her wrist. [Tr. 150.] None of these medical records indicate Simpson had problems with depression, or diagnoses of depression, neuro-myopathy, degenerative arthritis, notwithstanding Simpson's claims that some of these conditions existed as early as 1970 and 1994. She did have a walker [Tr. 150], but it's unclear whether it was prescribed for the fracture or another earlier condition.

9

***2003***

On January 19, 2003, Simpson was seen again at Wishard Health Services in Indianapolis. She had overdosed on unspecified medications and alcohol on her birthday. She stated she wanted to die because of "life in general." She was unemployed and reported having been beaten by someone the year before. She was drinking 12-15 beers "qd." She told the medical care staff she did not intend to stop drinking and did not want treatment for alcoholism. "I'd be lying if I promised to make it to an appointment." Simpson stated she was "looking forward to many more years of drinking." [Tr. 141.] She was not suicidal when sober. One of the medical records notes that Simpson's current medications included Paxil, Seroquil and Ethex. [Tr. 142.] It is unknown who prescribed the medications, if Simpson was diagnosed with depression, or if she took the medications for any length of time.

On July 6, 2003, Simpson visited the ER again because she felt faint and dizzy and had cramps. She was given Tylenol and Vicodin. Medical providers felt Simpson was dehydrated. [Tr. 138.]

On October 8, 2003, Simpson filed her application for SSI and DIB, alleging an onset date of April 15, 2001. [Tr. 60, 271.] She stated she did not live anywhere permanently. [Tr. 272.] At her face-to-face interview with disability staff, Simpson was observed to be walking very slowly with a walker. [Tr. 65.] This is the first indication in the record that Simpson presently used a walker.

In the disability report, Simpson noted she suffered from depression, neuro-myopathy, degenerative arthritis from 1994, alcoholism since 2000 and an inability to walk. She needed a walker to avoid falling. She had problems walking since January 1, 1994.

Simpson's work history included waitressing from 12/83 to 5/83, from 4/98 to 4/01. She went to the ER in Indianapolis in 2002 and 2003 for a broken arm, broken foot, suicide attempt and heat stroke. [Tr. 65.] She also went to St. Vincent's in Indianapolis in April 2001 for complaints of pain in her neck and back and for difficulty walking. [Tr.74, 75.] There are no corresponding records for any medical treatment before 2000. Simpson reported more specifically that she could not walk from 9/21/94 to 10/5/94 because of neuro-myopathy. She was given physical therapy and medications for the condition, but there are no corresponding medical records. [Tr. 75.]

On November 21, 2003, a consultative physician in Indiana attempted to review Simpson's medical records. He stated that he needed current information as the "client failed to cooperate." [Tr. 200.]

Simpson's SSI and DIB claims were denied in December 2003. [Tr. 265.] On a reconsideration disability report, filled out on December 12, 2003, Simpson wrote that her legs and feet were frostbitten when she was a teenager. This resulted in lasting effects of degenerative arthritis and neuro-myopathy that greatly affected her mobility. Cold weather increased her level of pain and this added to her depression. Some days, she did not want to get out of bed. She stated she must have missed her doctor's appointment (perhaps referring to the consultative physician's note) and had not received any notice of appointment. At this time, Simpson used a walker and had a chair in the shower for bathing. She could not carry food to a table and had to be served or helped. [Tr. 87-90.] None of the medical conditions or problems, i.e., frostbite, depression, degenerative arthritis are confirmed by corresponding treatment records.

A Wishard Memorial Hospital "abstract" summarizes some of Simpson's visits to the hospital during a period spanning 1988-2003. [Tr. 170, 174.] The brief notations include a three-day

11

hospitalization in 1988 for alcohol abuse, volume loss and abdominal pain.  In November 1988, the ER diagnosis for Simpson was "ETOH abuse."  [Tr. 176.]  That record notes that on January 19, 2003, Simpson's suicide gesture was "active."  However, none of these brief summaries of hospital visits from 1988 through 2003 indicate diagnoses of depression, degenerative arthritis or neuro-myopathy.  [Tr. 170-76.]

### *2004*

In early 2004, Simpson moved to New Mexico.  [Tr. 415.]  On April 10, 2004, Dr. Murtaza Parekh, a board certified physician in Internal Medicine, conducted a consultative examination of Simpson in Albuquerque.  [Tr. 202.]  Simpson had no primary care doctor then.  She alleged that she was depressed, had neuro-myopathy and degenerative arthritis, and was unable to walk.  She reported earlier frostbite to her legs and feet.  She stated she had been depressed for 10-15 years and was severely symptomatic at times.  Simpson had attempted alcohol withdrawal four times and had been taking Prozac in the past, but was not currently taking any medications.  She attempted suicide on multiple occasions but denied suicidal ideation on this date.  She had not had any medical or psychiatric care in New Mexico because she had just moved to the state.  Simpson reported  she had been told that her neuro-myopathy, diagnosed in September 1994, was secondary to alcohol use/abuse.  She felt residual weakness in her arms and legs.  She fell once a week but continued to drink alcohol.  She claimed to have degenerative joint disease that was diagnosed in 2000 after a car accident.

It is worth noting that other records indicated Simpson suffered from neuro-myopathy for a limited period of time in 1994 and was asymptomatic in 2000.  Other than when she fractured her foot, Simpson was not seen using a walker until after she applied for DIB and SSI.  She apparently

used a walker for a limited time period in 1994.  There are no medical records to confirm a diagnosis of degenerative joint disease in 2000 or after a car accident.  The records indicate Simpson had a car accident in 2000 but the x-rays were essentially normal without any diagnosis of degenerative joint disease.

Simpson reported to Dr. Parekh that she had residual numbness and tingling in her hands and feet from frostbite and was unable to walk.  She said the problem was due to a combination of neuromyopathy from September 1994 and frostbite which caused her to have difficulties walking, no sensation in her lower extremities and instability walking without a cane or walker.  Yet, she worked as a waitress for some periods of years in the 1980's and 1990's, and also worked in 2000 and 2001. [Tr. 55-57.]  The doctor observed Simpson was able to get up and off the exam table with a cane and able to dress and undress herself.  [Tr. 203.]  She was "slightly unstable" with a cane but walked into the room with a cane.  Dr. Parekh's impressions were lower back pain secondary to degenerative joint disease, and instability, likely secondary to chronic alcohol use and possible frostbite.  [Tr. 204, 205.]

On May 3, 2004, Dr. Gerald Fredman conducted a consultative psychiatric evaluation.  [Tr. 206.]  Depression was Simpson's chief complaint although there were no medical records to review. She had problems with depression for "as long as she could remember."  She wanted to sleep all of the time and did not care about life.  Her appetite was nonexistent and she frequently cried.  Her energy was poor and her concentration was diminished.  Simpson admitted to drinking two bottles of bourbon and a six-pack of beer every week.  [Tr. 206.]  When asked about this notation by the ALJ at the hearing in 2006, Simpson stated she actually drank more than that.  She stated she drank a lot – "an awful lot."  [Tr. at 436.]

13

Simpson told Dr. Fredman that she had a history of alcohol-induced blackouts, seizures and tremors.  She also said that she was told by doctors that her health problems related to alcohol consumption.  She again stated to Fredman that the neuro-myopathy was related to drug use.  [Tr. 206.]  She admitted alcoholism but initially denied illegal drug use [Tr. 206].  She later said she used marijuana on an earlier occasion before a hospitalization.

Simpson claimed she was treated for depression in the past with trials of different anti-depressants but there are no corresponding medical records or diagnoses.  She said the last time she was prescribed an anti-depressant was in 2000 when she was given Prozac in a residential treatment program.  She described drinking excessively since adolescence with periods of (unconfirmed) sobriety for up to five years.  Since 2000, however, she drank when alcohol was available.  She then acknowledged a past history of marijuana and cocaine abuse in the 1980's.  She had been married four times but said that all of the marriages ended due to "everybody's alcohol use."  [Tr. 207.]

Dr. Fredman observed that Simpson used a walker to help with ambulation and that she exhibited no obvious signs of anxiety.  [Tr. 207.]  She was coherent and logical.  Simpson acknowledged thoughts of suicide by overdosing, cutting herself, or jumping in front of a truck, but said her most important reason for living was her mother.  When asked what her three wishes would be if she were stranded on a deserted island in the middle of an ocean, she answered: "a drink, blanket and food."  [Tr. 208.]  Dr. Fredman concluded that she had a history consistent with alcohol dependence and a mood disorder.  She was drinking on a regular basis without treatment.  [Tr. 208.]  He diagnosed her with major depressive disorder, recurrent, severe; alcohol dependence;

14

neuromyopathy, osteoarthritis, status post frostbite in legs and feet.  He assigned a GAF of 49.[12]
Without mental health services, Dr. Fredman found her prognosis to be poor.  She had moderate
limitations in her ability to perform basic work tasks.  She was not able to handle her personal funds
because of continued use of alcohol.  [Tr. 208-09.]

On May 20, 2004, Simpson was seen in the ER at the University of New Mexico Hospital
(UNMH).  She had a seizure and reportedly had an untreated urinary tract infection.  She or her
mother stated Simpson had not had any alcohol for several days and that her history of seizures
stemmed in part from alcohol withdrawal.  [Tr. 211, 216.]  Simpson was discharged with diagnoses
of alcohol withdrawal, altered mental status secondary to alcohol intoxication withdrawal.  The
seizure disorder was secondary to most likely alcohol or electrolyte disturbance.  Hepatitis was likely
secondary to chronic alcohol abuse.  [Tr. 344.]

On May 21, 2004, a record from UNMH states Simpson had a 15-year history of alcohol
abuse, even though other records indicate she had a much more extensive history of alcohol use or
abuse.  [Tr. 213.]  She presented with upper and lower extremity clumsiness and weakness, mental
status changes, chest pain, vomiting, diarrhea, fatigue and urinary tract infection symptoms.  She was
semiconscious, and she "seized" in the ER.  She could not recall if she lost consciousness during that
episode or fall.  She had had 3-4 similar episodes related to alcohol use and withdrawal.  She admitted
drinking up to ½ pint of whiskey daily for three years but had not taken a drink for the last few days.
The record notes that Simpson was not on any medications.  Her past medical history was significant
for irritable bowel syndrome, alcohol abuse with withdrawal, "alcoholic myopathy."  [Tr. 213.]  She

---

[12] A GAF score of 41-50 indicates serious symptoms or serious impairment in social, occupational, or
school functioning, such as inability to keep a job." Langley v. Barnhart, 373 F.3d 1116, 1122 n. 3 (10th Cir.2004)
(quotations, brackets, and elipses omitted).

used a walker at home. She claimed to have remained sober for three years at a stretch but there are no records to confirm this. Simpson also had a 30-year history of tobacco abuse and a history of prostitution ten years ago. She suffered from generalized headaches. [Tr. 213.] The history of mental status changes was most likely due to electrolyte abnormalities, low potassium, low magnesium resultant to poor nutrition and alcohol consumption. The health care provider also stated they should consider cocaine and amphetamine use even though Simpson denied use. [Tr. 214.] The atrial fibrillation might have been due to drug toxicity. Simpson's seizures, weakness and clumsiness probably stemmed from electrolyte disturbance and alcohol withdrawal. Her nausea and vomiting were probably related to hepatitis-related alcohol withdrawal. [Tr. 214.]

In the daily activity form Simpson filled out June 1, 2004, she stated she used the walker to get to the bathroom and that her mother prepared meals and carried them to her. Simpson had a chair in the shower but her mother washed her back, took her to appointments and obtained medications for her. [Tr. 77.] Other records indicate that her mother also bought alcohol for her even when her diagnosis was grave. [Tr. 373.] Simpson was unable to drive. Her mother did the chores or paid for help. If Simpson went shopping with her mother, she went to stores where she could use a motorized scooter. Simpson kept to herself and had sleep problems. She was taking aspirin, potassium, promethazin for nausea, and calcium. [Tr. 82.] She stated she had depression and suffered from mood swings. [Tr. 82.] She also said she was hospitalized for emotional problems in Indiana in 1994. Simpson could not walk one block because her legs were paralyzed due to neuro-myopathy "caused by alcohol abuse in September 2004." She had degenerative arthritis in her spine and used a walker most of the time or a cane. She used a magnifying glass to read the disability form. [Tr. 85.]

16

On June 7, 2004, a UNM medical report states "This patient has a [sic] acute alcohol withdrawal with seizures as well as numerous other alcohol related symptoms and complications." [Tr. 215.]  On June 28, 2004, Dr. Elizabeth Chiang reviewed the records and performed a mental health review.  She found that an RFC assessment was necessary and that co-existing nonmental impairments required a referral.  She found that Simpson had an affective disorder, personality disorder and substance abuse disorder but that there was not enough information to precisely satisfy any of the diagnostic listing criteria for the conditions.  Dr. Chiang found mild limitations as to daily living, maintaining social functioning, maintaining concentration and insufficient evidence regarding repeated episodes of decompensation.  [Tr. 228-32.]

On another form, Dr. Chiang concluded that Simpson was not significantly limited in most areas but that she was moderately limited in the ability to respond appropriately to changes in the work setting and to set realistic goals.  [Tr. 237.]  Dr. Chiang noted current diagnoses of alcohol dependence and major depression.  [Tr. 238.]  The mental status exam was significant for depressed mood derealization and auditory, tactile and visual hallucinations.  But, the hallucinations were most likely due to excessive alcohol intake.  Dr. Chiang found the allegations of depressions to be credible but also concluded that Simpson's primary problem was alcohol dependence.  Simpson was able to work but not able to perform work that was too demanding.  [Tr. 238.]

On July 7, 2004, Dr. Mary Yoder performed a record review.  She noted Simpson's allegations of disability due to depression, neuro-myopathy, degenerative arthritis, inability to walk and frostbite.  It was clear that Simpson abused alcohol and had been hospitalized several times for acute alcohol intoxication.  Simpson had been drinking since 2000 and Yoder noted that Simpson did not always claim, as indicated by the medical records, that she suffered from neuro-myopathy.  In

17

fact, Simpson claimed she had a remission of her neuropathy when she quite drinking.  Dr. Yoder concluded that the substance abuse analysis was material and that the neuropathy would resolve if Simpson abstained from alcohol.  [Tr. 247-48.]

On July 8, 2004, the SSA denied reconsideration of Simpson's benefit applications.  The SSA found that drug addiction or alcoholism was a contributing factor material to a finding of disability. [Tr. 261.]  The agency form stated that while Simpson had depression, she was able to make decisions.  While she had physical problems, her condition could be expected to improve with abstinence from alcohol.  [Tr. 12.]

On August 20, 2004, Simpson appealed the denial.  But, she did not indicate any changes to her condition since she last filled out the forms.  There were no new physical or mental limitations. She had not seen a doctor or any provider for health care problems.  She wrote next to these questions "how?" implying she perhaps could not afford medical care.  However, she continued to buy or consume alcohol.  She stated on this form that the "neuro-myopathy that she experienced in 1994 was caused by extreme abuse of drugs and alcohol.  That is definitely not the case now.  I have been drug free for many years.  Although I have had alcoholic relapses in the past 10 years, I am now sober and focused on staying that way."  [Tr. 100-01.]

### *2005*

On January 25, 2005, Simpson saw Dr. Romero in Los Lunas.  The medical form indicates she was there to obtain disability forms.  The record states "occasional use of alcohol on this date." The record is difficult to decipher but may state "ETOH: 2-3 beers [or bottles] a week".  Simpson's pain level was a "7".  There is no mention of a diagnosis of depression.  [Tr. 254.]

On October 21, 2005, Simpson listed her recent medical treatment.  She saw Dr. Romero on January 25 and stated she kept two appointments for a blood test and a test on her legs.  However, she claimed she was denied treatment because she lacked funds.  There are no corresponding records. Simpson took Tylenol for pain and a multi-vitamin.

On November 17, 2005, Simpson attended the first ALJ hearing but indicated she wished to resume the hearing when she had counsel.  [Tr. 46.]

### *2006*

On March 6, 2006, Simpson saw Dr. Romero.  She was taking Atenol as of January 26, 2005 for her blood pressure.  She occasionally took Tylenol for pain because she did not like pain medications.  It appears that Dr. Romero sent Simpson to the hospital because she had not urinated for four days.  She had a severe kidney and bladder infection.  Although she was scheduled for an EMG at University of New Mexico Hospital on March 7, she was in the Emergency Room at that time.  [Tr. 105-08.]

The UNMH medical records from March 7, 2006 indicate Simpson had chronic lower back pain and was unable to urinate.  Her past medical history was significant for alcohol abuse.  Irritable bowel syndrome was noted, along with alcohol withdrawal, and alcoholic neuropathy/myopathy. Simpson had been a heavy drinker for a long time and then supposedly quit drinking approximately 6-8 years ago.  She recently started to drink again before deciding to stop last week.  Simpson complained of having chronic pain for one month above her bladder and radiating into her back.  Dr. Romero placed a catheter in her on March 6, but there was no urine output.  The medical providers

thought Simpson had a urinary tract infection but possibly pyelonephritis.[13]  [Tr. 328.]  Some of the medial records indicate Simpson was using a walker for ambulation and a wheelchair for 10 years. [Tr. 330.]

A gastroenterologist examined Simpson on March 8, 2008 and noted jaundice, oliguria,[14] abdominal pain and obstructive liver function results.  Simpson had a significant history of alcohol abuse but reported she was drinking very rarely then, perhaps once or twice a month.  However, she drank heavily for 16 years and said she quit in 2004 after her last hospital admission.  The likely etiology was alcoholic hepatitis.  [Tr. 338.]

On March 10, 2006, Simpson was discharged from the hospital after being diagnosed with alcoholic liver disease.  [Tr. 342.]   The discharge notes remark that while Simpson initially denied drinking she eventually admitted she was drinking although she said she was drinking less.  Simpson was told that if she continued to drink she would definitely die.  She stated she understood the recommendation and would continue her appointments with AA and attempt to stop drinking. Simpson "denied any depression counseling or any counseling regarding that."  [Tr. 342.]

On March 14, 2006, Simpson received notice that she had an interview on April 19, 2006 to redetermine her eligibility for general assistance based on a temporary disability and for food stamps. [Tr. 111.]

On March 23, 2006, Simpson appeared with counsel for her ALJ hearing.  [Tr. at 411.]  She testified that the last job she held was as a cashier in Colorado but that she was beat up by her live-in

---

[13]Pyelonephritis is "inflammation of the kidney and its pelvis."  Dorland's Illustrated Medical Dictionary (26th ed.) 1099.

[14]Oliguria is the secretion of a diminished amount of urine in relation to the fluid intake.  Dorland's Illustrated Medical Dictionary (26th ed.) 920.

boyfriend.  [Tr. 417.]  Simpson stated she had been using a walker for the past three years that was

prescribed by a doctor in Indiana whose name she did not recall.  [Tr. 418.]  At home, she needed

to use a walker to get around to the bathroom and back.  [Tr. 419.]  She was not able to go upstairs

or to sit or squat.  [Tr. 421.]  She could stand for five minutes and lift a few pounds.  [Tr. 422.]

With respect to drinking, she admitted she told the consultative physician in April 2004 that

she was drinking then.[15]  [Tr. 422-23.]  Simpson stated she stopped drinking between April 2004 and

January 2005 but that in April 2005 [sic - 2004?] she "slipped" back into drinking.  Simpson's mother

bought her alcohol.  [Tr. 423.]  Simpson stated she had been "clean" except for a few occasional

relapses during the last 15 months.  [Tr. 423.]  In response to whether she attended AA meetings,

Simpson said she had been in the program, "very much so" and that she had been a few times but was

too weak to return after the hospitalization in 2006.  [Tr. 424.]

Simpson had trouble sleeping and reported joint pain since 1994 when her myopathy started.

[Tr. 425.]  She was able to watch television and listen to music.  She could not return to waitressing

because she was unable to carry trays or stand without a walker.  [Tr. 428.]  Simpson was not taking

any medications for pain or depression because of her addictive personality.  [Tr. 429.]

In response to questions by the ALJ, Simpson stated she had lived in homeless shelters when

she was not working from 2002-2005.  The primary problems she identified concerned her legs and

back which she described as being part of her depression.  She said she felt useless.  [Tr. 432.]  She

---

[15]The notes from the May 2004 consultative exam by Dr. Fredman also indicate Simpson admitted she
was drinking in May 2004.  At that time, she was drinking about two bottles of bourbon and a six-pack of beer
every week.  [Tr. 206.]  On May 21, 2004, Simpson stated she had not had a drink in the last few days but had
been drinking up to ½ pint of whiskey daily for three years.  [Tr. 213.]  The May 21, 2004 hospital record indicates
that Simpson had remained sober for a three year period of time but "again recently [started] heavy drinking,
drinking one-half to one pint of whisky daily."  [Tr. 213.]  It is uncertain what period of time Simpson stopped
drinking.  There are no medical records between May 2004 and 2005 that indicate whether or not Simpson was
drinking.

did not think her depression was related to alcoholism.  Again, she said she had stopped drinking since January 2005 but that she had "slipped" a couple of times since then.  She admitted she had not been to AA meetings for a month and that in earlier years she drank more than two bottles of bourbon and a six-pack of beer a week.  [Tr. 436.]

On May 27, 2006, Simpson was seen at Lovelace.  She had passed out in the bathroom.  The medical records indicate she had cirrhosis and continued drinking.  [Tr. 287.]  She was too weak to stand.  A Lovelace medical note indicates "positive" for "ETOX 12-20 oz tequila."  [Tr. 304.]  The Lovelace (Sandia Health System) "history and physical" dated May 27, 2006 states "alcohol history is positive by 12 to 20 ounces of tequila day" and that Simpson's last drink was May 26th.  [Tr. 371.]  She began having rectal bleeding two weeks ago.  Her prognosis was grave.  She was not a candidate for a liver transplant or a steroid trial.  Hospice care was recommended.  [Tr. 299.]  While Simpson understood that her condition was grave if she continued to drink, she said she still was going to drink.  [Tr. 372.]  Medical care providers discussed Simpson's grave prognosis with her mother who stated she too understood the diagnosis but would continue to purchase alcohol for her daughter.  [Tr. 372-73.]

Simpson was admitted to Lovelace on May 30, 2006 with hepatic cirrhosis.  [Tr. 286-87.]  On May 31, 2006, Simpson's attorney wrote the ALJ reporting that Simpson was hospitalized recently with end stage cirrhosis.  [Tr. 278.]  On June 2, 2006, Simpson died.  Her death certificate stated she died of cardiopulmonary arrest and end state liver disease and ETOH.  [Tr. 276.]  Alcohol abuse was listed last which indicates on the form that it was the underlying cause of death.

On June 15, 2006, the ALJ issued his opinion denying benefits to Simpson.  [Tr. 12.]

### Discussion

In 1996, Congress amended the Social Security Act to preclude an award of benefits if drug or alcohol abuse "is a contributing factor material to the Commissioner's determination that the individual is disabled."  42 U.S.C. § 423(d)(2)(C).  The amendment was adopted as part of the contract with America Advancement Act ("CAAA"), Public Law 104-121, whose purpose was "to discourage alcohol and drug abuse, or at least not to encourage it with a permanent government subsidy."  Ball v. Massanari, 254 F.3d 817, 824 (9th Cir. 2001).  Therefore, in drug abuse and alcoholism cases, a finding of "disability" under the sequential evaluation does not automatically mean that a claimant qualifies for benefits under the SSA.

Once the threshold determination is demonstrated that a claimant has a disability, the ALJ must then assess the role alcohol abuse plays in the demonstrated disability.  Chambers v. Barnhart, 2003 WL 22512073 at *2 (10th Cir. Nov. 6, 2003) (*citing* Drapeau v. Massanari, 255 F.3d 1211, 1214-15 (10th Cir. 2001)).  The ALJ does so by determining which of the claimant's disabling limitations would remain if the claimant stopped using alcohol.  20 C.F.R. § 404.1535(b).  If the remaining limitations still would be disabling, even if the claimant stopped using alcohol, then the alcoholism is not a contributing factor material to the disability.  But, if the remaining limitations would not be disabling after cessation of the substance abuse, then the claimant's substance abuse would be material and benefits must be denied.

Stated differently, "[t]he ALJ must find plaintiff not disabled if alcoholism or drug addiction is a contributing factor material to his disability determination."  Bainer v. Barnhart, 2004 WL 2009426 at *3 (D. Kan. Aug. 19, 2004) (citing 42 U.S.C. § 423(d)(2)(C)).  The key inquiry is whether the plaintiff would still be disabled if she stopped using drugs or alcohol.  Id.; 20 C.F.R. §

404.1535(b)(1).  The ALJ determines which of plaintiff's limitations would remain if she stopped using drugs or alcohol.  Id.  If the ALJ decides that the plaintiff's remaining limitations would not be disabling, her drug addiction or alcoholism is then considered a contributing factor material to the disability determination.  Id.  However, if the plaintiff's remaining limitations are still disabling, her drug addiction and alcoholism are not contributing factors material to the disability determination.  Id.  Under the latter scenario, the plaintiff then would be found disabled, independent of her addictions.  Id.

After the enactment of this law, the Social Security Administration sent out a teletype on applying it.  The teletype stated in part that "when it is not possible to separate the mental restrictions and limitations imposed by [drug and alcohol abuse] and the various other mental disorders shown by the evidence, a finding of 'not material' would be appropriate."  "In other words, the agency directed that if the effects of a claimant's mental illness could not be separated from the effects of substance abuse, the abuse would be found *not* to be a contributing factor material to the disability determination."  McGoffin v. Barnhart, 288 F.3d 1248, 1252-53 (10th Cir. 2002).

Clearly, if the claimant's only impairments are drug and alcohol related, the analysis might be straight forward.  But, the analysis is more complicated where the plaintiff has other impairments in addition to drug and alcohol addictions.

> The most complicated and difficult determinations of materiality will involve individuals with documented substance use disorders and one of [sic] more other mental impairments.  In many of these instances, it will be very difficult to disentangle the restrictions and limitations imposed by the substance use disorder from those resulting from other mental impairment(s).

Stuart v. Barnhart, 2003 WL 1054014 at *3 (D. Kan. Feb. 24, 2003) (citing Cox, Dale, Social Security Administration, Emergency Teletype, August 30, 1996).

24

Here, the ALJ essentially found at step three that Simpson had an impairment or combination of impairments that met a listing but that if she stopped the use of alcohol she would not be disabled. Thus, the ALJ concluded that Simpson's alcohol abuse was a material factor contributing to her disability. At step four, the judge concluded that without substance abuse, Simpson would have the RFC to perform a full range of light work, which would not preclude work as a waitress.

## I.     DA&A Analysis

Simpson argues that the ALJ did not correctly perform the DA&A analysis, that he relied on a single piece of evidence authored by a consultative physician for his finding of materiality, that it is not possible to separate the limitations imposed by alcoholism from the other impairments, and generally that the ALJ's finding of materiality is not supported by substantial evidence. Simpson also contends that the Tenth Circuit Court of Appeals' opinion in Salazar v. Barnhart, 468 F.3d 615 (10th Cir. 2006) is a "case strikingly similar to the instant matter" and that the reasoning and result in Salazar support a reversal in this case.

The Court concludes that the ALJ correctly performed the DA&A analysis and that substantial evidence supports the ALJ's finding of materiality. In addition, the Court rejects Simpson's position that Salazar is "strikingly similar" to this case.

First, the ALJ carefully and thoroughly considered the "entire record" in making his findings. [Tr. 14.] Next, the ALJ found that Simpson had a number of severe impairments, i.e., "alcohol dependence with alcoholic liver disease, and neuropathy/myopathy; degenerative joint disease; history of right wrist fracture; history of left foot fracture; and, a history of depression. [Tr. 15.] The ALJ concluded that these impairments, including the substance use disorder, met listing § 11.14 (peripheral neuropathies). The ALJ, as required, then assessed "the role alcohol abuse plays in the

demonstrated disability." In other words, the ALJ examined which of Simpson's disabling limitations would remain if she stopped using alcohol. *See* 20 C.F.R. § 404.1535(b).

The key inquiry, as determined by the ALJ, was whether Simpson would still be disabled if she stopped using alcohol. 20 C.F.R. § 404.1535(b)(1). The ALJ made detailed findings regarding this determination. First, he concluded that if Simpson stopped abusing alcohol, her degenerative joint disease and residuals from the fractures and alcohol abuse would remain and would be severe impairments. Next, he found that if she ceased her substance abuse, Simpson would not have a severe medically determinable psychological impairment. Third, the ALJ determined that if Simpson ceased drinking, none of the severe impairments, including the neuropathies, degenerative joint disease and fractures would meet listing requirements because Simpson's alcoholism was material to a finding of disability at step three. The ALJ proceeded to examine Simpson's RFC. The Court finds that the ALJ's DA&A analysis followed the regulatory procedures in accordance with 20 C.F.R. §§ 404.1535(b).

The Court also concludes that substantial evidence supports the ALJ's finding that Simpson's alcoholism was a contributing factor material to the disability determination. Simpson attempts to paint a picture of long-term and debilitating neuropathies, unrelated to alcohol abuse. For example, she states that she had problems with walking in 1970 and from neuropathies in 1994. [Tr. 68.] Simpson's attorney states that her "peripheral neuropathy" first emerged in August 2002 when she was seen at an ER. [Doc. No. 13, p. 2.] The medical record cited is brief and notes only a new onset of bilateral peripheral edema. It also states that Simpson was to make a follow-up appointment regarding this condition [Tr. 178], but there are no medical records documenting follow-up appointments, assessment or treatment.

Simpson's counsel then states "[b]y April 2004, Ms. Simpson had developed muscle weakness in her arms and legs with numbness and tingling that was constant in her arms and legs. [Tr 202]" The recited history might imply that Simpson's condition was steadily worsening over several years. However, there are no confirming medical records that support mere argument and contention. Instead, on April 20, 2004 [Tr. 202], Simpson was providing a consultative physician with a description of her subjective complaints, i.e., "residual weakness in her arms and legs with numbness and tingling. . . ."  Not only that, but Simpson reported to the consultative physician on that date that she had been told her neuromyopathy, diagnosed in 1994, was "secondary to alcohol." [Tr. 202.] In addition, she told the consultative physician that "she falls once a week and continues to drink alcohol." [Tr. 202.]

Simpson's attorney emphasized that Simpson "was also using a cane to assist her with ambulation" in April 2004.  However, the consultative physician noted on that date that Simpson's "instability, [was] likely secondary to chronic alcohol use and possible frostbite."  [Tr. 205.] Simpson's attorney then focused on May 2006 when Simpson was dying from alcohol-related conditions.  He argued that Simpson's "condition worsened by May 2006, when she was seen at Lovelace medical center secondary to decreased strength and lower extremity weakness. By this time Ms. Simpson required the assistance of a front-wheeled walker in order to ambulate secondary to peripheral neuropathy. (Tr 371)" Counsel fails to mention, however, that Simpson's alcohol history on this date was "positive by 12 to 20 ounces of tequila a day" and that her last drink was the night before the hospital visit.  [Tr. 371.]  Her alcoholism was so severe that her physicians warned that continuation of this abuse would result in her death.  Nonetheless, Simpson stated that she would continue to drink even though she was diagnosed with alcoholic liver cirrhosis.  [Tr. 372.]  Both

27

Simpson and her mother were advised of Simpson's "grave" condition due to her drinking, but Simpson refused to stop drinking and her mother said she would continue to buy alcohol for Simpson. [Tr. 373.]  Soon thereafter, Simpson unfortunately died due to causes related to alcohol abuse.

The picture that Simpson suffered for years from neuromyopathies unrelated to alcoholism is simply not supported by the record.  Repeatedly, the record indicates that her neuromyopathies were short-term in nature or related to alcoholism.  Simpson's medical history showed myopathy in 1994 when her drinking was out of control.  [Tr. 180-82.]   Simpson reported having a neuromyopathy for one year in 1994 for which she needed a walker but that she had no symptoms as of September 13, 2000.  [Tr. 183.]  On October 25, 2000, she was seen for problems related to binge drinking.  None of the extensive medical notes indicate Simpson was unable to walk or that she had neuromyopathies.  One note indicates "sensory and motor intact."  [Tr. 123.]  Her falls and other physical injuries were related to Simpson passing out due to her drinking, or being thrown out of bars, or being assaulted related to her intoxication.  [Tr. 164.]

In 2002, Simpson has few medical records.  She was assaulted at one point and suffered several fractures when she was thrown outside a bar, intoxicated.  [Tr. 164.]  Again, these medical records do not indicate problems with neuromyopathies other than the one brief notation that she had a new onset of bilateral peripheral edema for which she was to seek follow-up care.  [Tr. 178.]

In 2003, Simpson was seen at the ER related to a suicide attempt.  She was drinking 12-15 beers "qd."  [Tr. 141.] She did not intend to stop drinking and did not want any treatment.  She said she would be lying if she said would attend a treatment appointment.  Once she was treated, she was "ok now", smiling, and denied any suicidal ideation.  The records do not indicate she was unable to walk because of neuromyopathies.  However, on October 2003, when she applied for benefits,

28

Simpson claimed she had degenerative arthritis, problems walking and needed to use a walker.  [Tr. 67.]  More specifically, however, she reported that she had been unable to walk only from September 21, 1994 to October 5, 1994 because of neuro-myopathy.  [Tr. 75.]

In 2004, Simpson told the consultative physician that she was diagnosed with neuromyopathy in September 1994 and that she was told it was secondary to alcohol.  [Tr. 202.]  She had been able to work as a waitress in later years.  [Tr. 202-204.]  The consultative physician concluded that her instability was most likely secondary to chronic alcohol use and possible frostbite.  [Tr. 205.]  On May 4, 2004, she told the consultative psychiatrist that she was informed her neuromyopathy was related to alcohol use.  [Tr. 206.]  Nonetheless she was drinking two bottles of bourbon and a six-pack of beer every week at this time.  On May 21, 2004, Simpson was treated at the ER for seizures, lower extremity clumsiness and weakness, vomiting, etc.  [Tr. 213.]  Her past medical history on this form states "alcoholic myopathy."  She was drinking heavily at this time.  [Tr. 213.]  She was diagnosed with acute alcohol withdrawal with seizures and numerous other alcohol-related symptoms and complications.  [Tr. 215.]

On June 1, 2004, Simpson filled out a daily activities report in which she stated that she could not walk one block because her legs were paralyzed due to neuro-myopathy.  She further explained that it was caused by alcohol abuse in September 1994.  [Tr. 83.]

On July 7, 2004, Dr. Mary Yoder reviewed the records for disability services and noted accurately that Simpson did not always claim neuromyopathy when she was treated.  Dr. Yoder commented that Simpson admitted she had a remission of her neuropathy when she quit drinking.  Dr. Yoder opined that if Simpson abstained from alcohol use, the neuropathy would resolve.  [Tr. 247.]

On August 20, 2004, Simpson filled out a disability report in which she stated she was unable to go anywhere without a walker but that the "neuro-myopathy that I experienced in 1994 was caused by extreme abuse of drugs and alcohol." [Tr. 100-01.] While Simpson tried to say that could not be the case now since she had been drug free for many years, she admitted to recent heavy drinking in May 2004. [Tr. 214.] Indeed, notwithstanding her claims that she had been sober for extended periods of time, her medical records and own reports belie that representation.

There are no significant medical records from 2005, but on March 7, 2006, she was seen for low back pain and inability to urinate. The past medical history notes alcoholic neuropathy/myopathy. [Tr. 328.] In addition, the medial record indicates she had started to drink recently. On this date, she indicated she had used a walker or wheelchair for ten years, which is improbable based on her work history as a waitress and inconsistent with other medical records.

The Court concludes that substantial evidence supports the ALJ finding that Simpson would not suffer significant neuromyopathies if she stopped abusing alcohol. Moreover, it is clear from an examination of the record and the ALJ's opinion, that in so finding, the ALJ relied on far more medical evidence than Dr. Yoder's examination of the records alone. Simpson herself repeatedly reported that she was told her neuromyopathies were related to alcohol consumption.

Substantial evidence also supports the ALJ's finding that absent alcohol abuse, Simpson would not be disabled due to residuals from her fractures or degenerative joint disease. There is no indication in the record that Simpson did not heal from the fractures, and there are very few references in the record to any diagnoses of or treatment for degenerative joint disease. Although Dr. Murtaza Parekh, the consultative physician, found that Simpson's lower back pain and neck pain

were secondary to degenerative joint disease [Tr. 204], he also found her instability was likely secondary to chronic alcohol use. [Tr. 205.]

The ALJ carefully considered Dr. Parekh's evaluation along with the fact that Simpson had very few treatment visits for back pain or other musculoskeletal impairments. The ALJ noted that on March 7, 2006, there was no evidence of a musculoskeletal basis for her complaints of back pain, and that her reflexes were normal. [Tr. 18.] The Court finds substantial evidence to support the ALJ's finding that the root cause of all Simpson's medical problems was alcohol abuse.

The Court also rejects Simpson's attempt to analogize this case to the situation in Salazar. Simpson's counsel argues that similar to the facts in Salazar, it is not possible here to separate the alcohol restrictions imposed by Simpson's alcohol abuse from various other impairments. The facts and medical records in Salazar are distinguishable from those present in Simpson's case.

In Salazar, the Tenth Circuit observed that Ms. Salazar's medical records contained diagnoses of borderline personality disorder, major depressive disorder, drug and alcohol addiction and an unhealed broken left arm. Salazar, 468 F.3d at 617. Multiple healthcare providers diagnosed Salazar with major depressive disorder and borderline personality disorder. Id. at 617, 618, 621-22. There were multiple medical records documenting Salazar's attempts to commit suicide and cut herself. She was found running in traffic, crawling down streets, wandering through the streets, dressed in nothing but her underwear outside her home, and jumping into a river. Her feet were injured from her attempts to brand them with a hot coat hanger. Id. at 617-18. Salazar was described as being "filthy, disheveled and intoxicated." She was treated for a broken left arm after she jumped from a fast-moving vehicle while intoxicated. Id. at 619. She described a lifetime of problems including serious depression and anxiety. She was hospitalized for depression. Id. at 621. Under that set of facts, the

Tenth Circuit concluded that it was improper for the ALJ to have failed to consider whether her borderline personality disorder, which was well documented by medical records, might account for her abuse of drugs and alcohol as well as her self-mutilation and suicide attempts.  Id. at 622.

In addition, the Tenth Circuit concluded that the ALJ misread the evidence when he concluded that Salazar's mental impairments improved after a period of sobriety because there was medical documentation that after a period of sobriety, Salazar was referred for inpatient psychiatric treatment for "increasing depression, hopelessness, and suicidal ideation."  Id. at 624.  In Salazar, unlike this case, the claimant also raised a successful argument that the ALJ failed to explain why he ignored the opinions of treating physicians.  Id. at 625-26.

Here, Simpson was not diagnosed repeatedly by treating physicians with various mental disorders.  While there are some records regarding a suicide attempt on her birthday, most of the references to suicidal ideation are subjective reports by Simpson.  In addition, Simpson's suicide attempt clearly was related to alcohol abuse.  In contrast, the Tenth Circuit, in Salazar, was unconvinced that Salazar's suicide gestures were secondary to her DAA.

In this case, most of the references to Simpson's depression are subjective reports Simpson made to consultative physicians.  Diagnoses of depression or any related mental disorders are absent from almost every medical record that exists as part of this administrative record.  There is virtually no corroborating medical evidence that Simpson was treated for depression, other than her statements that she was given some trials of anti-depressants.  She generally refused counseling or any treatment for alcoholism and apparently did not seek out any kind of help.  She insisted on drinking even when she was near death, and in the end, virtually drank herself to death.  In contrast, Salazar expressed "an extreme need for treatment" for her psychiatric problems.  Id. at 619.

32

In sum, the Court concludes there was substantial evidence to support the ALJ's finding that alcoholism was a contributing factor material to the determination of disability in Simpson's case.

## II.   <u>Severe Mental Impairment</u>

Simpson argues that the ALJ committed legal error in finding that she did not suffer from a severe psychological impairment because the ALJ ignored the consultative psychiatrist's evaluation. She also argues that Dr. Elizabeth Chiang, a reviewing psychiatrist, supports a finding of severe psychological impairment.

First, the Court observes that Dr. Chiang's report acknowledges that Simpson's allegations of depression were credible. However, Dr. Chiang further stated "[Simpson's] primary problem is Alcohol Dependence.  Work can be performed that is not too demanding."  Dr. Chiang concluded that Simpson was not significantly limited in most areas.  [Tr. 236-37.]  Such findings are consistent with the ALJ's determination.

Dr. Gerald Fredman, a consulting psychiatrist, interviewed Simpson on May 3, 2004.  He had no records to review and based his findings on one evaluation of Simpson and her subjective reports of her history and condition.  [Tr. 206-09.]  He concluded, *inter alia*, that on Axis I, she had diagnoses of "major depressive disorder, recurrent, severe; alcohol dependence."

Simpson did not have a treating physician.  Based on the medical records, when Simpson obtained medical care, it usually occurred in the ER or a hospital.  The administrative record does not indicate she received counseling or psychological treatment.  If offered or recommended, Simpson either did not follow up with such care or rejected it.  She did tell Dr. Fredman that there was residential treatment for alcohol dependence on three or four occasions but there are no corresponding medical records.  [Tr. 207.]

33

The pertinent regulations state that ALJ's are not bound by findings made by State agency medical or psychological consultants or other program physicians or psychologists.

> However, State agency . . . physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation.  Therefore, administrative law judges must consider findings of State agency medical . . . consultants or other program physicians . . . as opinion evidence, except for the ultimate determination about whether you are disabled.

20 C.F.R. § 404.1527(f).  Social Security Ruling 96-6p provides that findings of fact made by other program physicians regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence.  ALJ's may not ignore these opinions and must explain the weight given such opinions in their decisions.  S.S.R. 96-6p.

Here, the ALJ considered Simpson's alcoholism and depression, finding that she had "a severe impairment under §§ 12.04 and 12.09 associated with repeated episodes of decompensation of extended duration associated with her binge drinking and residuals."  [Tr. 16.]  However, the ALJ concluded there was no basis to find Simpson would have any psychological limitations if she discontinued alcohol abuse.  [Tr. 16.]  The record as a whole supports the ALJ's conclusion.

In so finding, the ALJ carefully discussed and considered both consulting physicians' opinions. along with the entire record. [Tr. at 15-16.]  Dr. Parekh noted that Simpson reported she had a 10-15 year history of depression, and that when she was severely symptomatic, she did not get out of bed. The ALJ observed that the medical records contained few references to psychological problems to support Simpson's alleged history.  [Tr. 16.]

The ALJ discussed a medical record from September 2000, when Simpson was evaluated for a sleep disturbance and anxiety associated with alcohol withdrawal.  The medical history taken then contained boxes to check off for complaints of depression, hopelessness, decreased energy and

worthlessness but none of those boxes were checked. [Tr. 16, 180.] Simpson reported her drinking was getting out of control. [Tr. 181.] The psychological findings at that time were within normal limits. [Tr. 182.] The one suicide attempt that is documented by medical evidence clearly was associated with drinking, as discussed by the ALJ. [Tr. 16.]

The ALJ further explained why he did not give "significant credibility to the overall assessment of Dr. Fredman" that Simpson suffered limitations associated with depression. [Tr. 16.] First, the ALJ noted that Dr. Fredman found moderate rather than marked limitations associated with her depression and alcoholism. Second, there was no corroborative documentation of significant problems associated with depression. Moreover, recent medical records did not confirm diagnoses of depression or complaints by Simpson of depression.

Consequently, the ALJ found Simpson had mild rather than moderate limitations when she was not drinking. As observed by the ALJ, the clinical assessment of Simpson's psychological condition when she was not drinking was normal.

It is also worth noting that Simpson reported to Dr. Fredman that she was drinking two bottles of bourbon and a six-pack of beer per week at this time. She reported a past history of alcohol-induced blackouts, seizures and delirium tremors. Simpson stated that alcohol interfered with family obligations and work responsibilities in the past. Her four marriages ended because of "everybody's alcohol use." [Tr. 206-07.] Simpson did not say that depression interfered with her work and social responsibilities.

Dr. Fredman observed that Simpson appeared on time for the interview, was appropriately dressed and groomed, and was cooperative. Her eye contact was fair and he felt she was of average intelligence. There was no obvious evidence of anxiety and she was oriented to time, place, person

35

and place of examination.  Her thoughts progressed in a logical and coherent manner.  She had some hallucinations but there was no evidence of delusions, paranoid ideation or feelings of depersonalization.  Her three wishes on a deserted island were "a drink, blanket, and food."  [Tr. 208.]

Dr. Fredman's assessment started by noting Simpson had a history consistent with alcohol dependence and was drinking on a regular basis.  He next said that she had a history consistent with a mood disorder but was not receiving mental health services.  [Tr. 208.]  While Dr. Fredman stated that Simpson's rendition of her history was consistent with a mood disorder, but his report did not emphasize that he observed Simpson to be depressed.  He noted that there was "rumination of suicide and depressed mood."  [Tr. 208.]  He also stated that it was probable that there was a cluster B personality disorder, but that psychology testing was necessary to clarify the issue.  No such testing is a part of the record.

The Court determines that substantial evidence supports the ALJ's findings regarding Simpson's depression and that he did not commit legal error by ignoring or discounting Dr. Fredman's opinion.  The ALJ appropriately explained the weight he gave Dr. Fredman's opinion and why he did not give it more weight.  Opinions of program physicians can be given weigh only insofar as they are supported by evidence in the case record.  SSR 96-6p, at *2.  The ALJ's analysis and consideration of Dr. Fredman's opinion complied with the pertinent regulations.

III.   **Ability to Perform Past Relevant Work**

Simpson argues that the ALJ committed error in determining she could return to work as a waitress when the ALJ did not perform the legal analysis required by SSR 82-61 and Tenth Circuit case law.  Simpson asserts that the ALJ should have made specific findings as to her RFC, the

physical and mental demands of the prior relevant work experience and her ability to return to that position given her RFC. Simpson admits that the ALJ stated he considered the physical and mental demands of waitressing but argues the ALJ did not mention any specific evidence he relied upon to support his conclusion.

Simpson primarily relies on her own subjective reports of impairments and on the consulting physician's report that she had lower back pain and neck pain due to degenerative joint disease and was limited in her ability to walk because of instability. [Tr. 204-05.] Simpson argues that there is no evidence of record to support a finding that she could lift up to 20 pounds occasionally or that she stand or walk 6 hours a day. Instead, she argues that there is evidence in Dr. Parekh's report that Simpson could stand for less than one hour a day and could only walk one-half a block due to instability and "extremely poor proprioception." [Tr. 202.]

In making his RFC finding that Simpson could perform a full range of light work, including lifting up to 20 pounds occasionally and 10 pounds frequently, standing or walking 6 out of 8 hours and sitting up to 6 hours a day, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements . . . ." [Tr. 17.] The ALJ also considered opinion evidence of the consulting physicians. He took into account Simpson's recitation of her of medical and vocational history, her alleged periods of sobriety, her testimony that she could stand only five minutes with her walker, sit for 30 to 45 minutes and lift only two pounds. [Tr. 17.]

The ALJ concluded that if Simpson stopped the substance abuse, her medically determinable impairments could be expected to produce the alleged symptoms but not to the extent Simpson claimed because Simpson was not entirely credible. [Tr. 17.] The ALJ explained that Simpson

received only minor back injuries in the 2000 motor vehicle accident and that her fractures in 2002 healed with significant residuals. All other objective medical evidence and treatment related to problems caused by acute or chronic alcohol abuse.

The ALJ further noted that while Dr. Parekh found Simpson would have difficulty walking and lifting due to instability, other treatment notes indicated Simpson could stand and walk. Moreover, Dr. Parekh concluded that Simpson's instability was secondary to chronic alcohol abuse. [Tr. 205.] The ALJ further explained that there were few treatment visits for back pain or other musculoskeletal impairments. Virtually all of the treatment Simpson received stemmed from problems caused by alcohol abuse. Yet, regardless of the medical advice given, Simpson insisted on drinking even when close to death.

The ALJ determined that Simpson's past relevant work was light and semiskilled in nature. He compared her RFC, if she stopped substance abuse, with the physical and mental demands of the work, and found that Simpson could perform the job of waitress as it is actually and generally performed. [Tr. 19.]

The Court concludes that substantial evidence supports the ALJ's RFC finding. Moreover, if any error occurred in the ALJ's step four analysis by his failure to discuss in detail the demands of Simpson's prior relevant work, the error was harmless. While the ALJ did not specifically discuss the Dictionary of Occupational Titles (DOT) in examining the demands of the job, he stated that he had compared those demands to Simpson's RFC. The pertinent regulations allow the Agency to take administrative notice of job data and "reliable job information" from various publications, including the DOT. 20 C.F.R. §§ 404.1566(d) and 416.966(d). The DOT lists waitress jobs. *See also* S.S.R.

82-61 at *2 (1982) ("DOT descriptions can be relied upon – for jobs that are listed in the DOT – to define the job as it is *usually* performed in the national economy.")

Simpson also argued that the ALJ erred by making no findings whether Simpson could maintain employment as a waitress for a significant period of time.  The Court rejects this argument.  The ALJ need not make a specific finding regarding the claimant's ability to maintain employment in every case.  Frank v. Barnhart, 326 F.3d 618, 619 (10th Cir. 2003).  Usually, that inquiry is subsumed in the analysis regarding the claimant's ability to obtain employment.  Id. at 619.

This is not a case where Simpson's impairments waxed and waned, thereby requiring an analysis of whether the claimant could maintain employment.  Instead, this is a case where substantial evidence supports the ALJ's conclusion that Simpson had the RFC to perform her prior relevant work, if she had not been abusing alcohol.

### Conclusion

IT IS THEREFORE ORDERED that Plaintiff's Motion to Reverse or Remand Administrative Agency Decision is DENIED.

*Lorenzo F. Garcia*

Lorenzo F. Garcia
Chief United States Magistrate Judge